**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| PLAINTIFF, | : | |
| | | **CASE No. 2:24-CR-107** |
| vs. | : | |
| | | **JUDGE EDMUND A. SARGUS** |
| **CARLOS SERRANO-RESTREPO** | : | |
| DEFENDANT. | : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO DISMISS INDICTMENT**

Carlos Serrano-Restrepo, an alien unlawfully in the United States, has been charged with violating 18 U.S.C. § 922(g)(5). He has filed a Motion to Dismiss arguing that 18 U.S.C. § 922(g)(5), as applied to him, violates the Second Amendment to the United States Constitution. As explained below, the Court should deny the Motion to Dismiss.

                                                     Respectfully submitted,

                                                     KENNETH L. PARKER
                                                     United States Attorney

                                                     s/Heidy T. Carr
                                                   **HEIDY CARR (0093524)**
                                                   Special Assistant United States Attorney
                                                   **ELIZABETH GERAGHTY (0072275)**
                                                   Assistant United States Attorney
                                                   303 Marconi Boulevard, Suite 200
                                                   Columbus, Ohio 43215
                                                   Phone: (614) 255-1608
                                                   Fax: (614) 469-5653
                                                   E-mail: Heidy.Carr@usdoj.gov

## MEMORANDUM

I.    **BACKGROUND**

Carlos Serrano-Restrepo ("Serrano-Restrepo") is a citizen of Colombia where he was born in 1978. (*See* Doc. #: 25, PAGEID #: 63). By his own admission, he entered the United States illegally in 2008. (*Id.*) Records show that Serrano-Restrepo entered the United States illegally and under the false name of Jesus Lopez-Juarez on March 31, 2008. (*See* Exhibit 1). Serrano-Restrepo was apprehended by border patrol agents, fingerprinted, and asked to return to his home country, being denied entrance to the United States at the border. (*Id.*)

The United States Citizenship and Immigration Services ("USCIS") does not have any records showing when Serrano-Restrepo re-entered the United States after his denial on March 31, 2008. Serrano-Restrepo, however, asserts in his asylum application and his present motion that his last entry to the United States was on April 17, 2008 in New York, just over two weeks after his initial apprehension and denial at the border. (*See* Exhibit 2). While his asylum application—filed years later in 2022— remains pending, allowing him to stay in the United States until a final decision is rendered, it does not grant him legal immigration status or benefit in the United States, as the Notices of Action from the Department of Homeland Security prominently highlight. (*See* Doc. # 25, Exhibits: B, I, J, K, L, M).

In August 2023, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) received eleven multiple sale summary reports regarding Carlos Serrano-Restrepo. These reports were filed due to Serrano-Restrepo's purchase of two or more handguns from the same Federal Firearms Licensee (FFL) either within a single transaction or within five days of one another. The records show that Serrano-Restrepo acquired over 160 firearms between May 2023 and

January 10, 2024, all from the same FFL located in Millersburg, Ohio, within the Northern District of Ohio.

In March 2023, Serrano-Restrepo had purchased firearms online and had them shipped to the Millersburg FFL. Upon attempting to retrieve these firearms and complete the transfer, Serrano-Restrepo was informed that he could not acquire them due to holding a Washington state driver's license. Despite this, he was able to receive two long guns from the same online purchase. During this transaction, Serrano-Restrepo completed the ATF Firearms Transaction Record (ATF Form 4473), falsely indicating his citizenship as both United States and Colombian and asserting that he was neither unlawfully in the United States nor admitted under a nonimmigrant visa. (*See* Exhibit 3)

After being denied the firearms, Serrano-Restrepo obtained an Ohio driver's license by reporting his status as a "temporary resident" to the Bureau of Motor Vehicles (BMV). Subsequently, on or about May 12, 2023, he returned to the FFL with his Ohio driver's license and successfully retrieved 13 firearms. He completed Form 4473 with the same misrepresentations as before. (*Id.*)

Between May 13, 2023, and January 10, 2024, Serrano-Restrepo visited the FFL at least six times, acquiring over 90 additional firearms purchased online. Each visit involved completing Form 4473 with similar misrepresentations.

On January 10, 2024, ATF agents executed a search warrant at Serrano-Restrepo's residence at 1800 Lynnbrook Court, Orient, Ohio, 43146, located in the Southern District of Ohio. This address was listed on his BMV application and all Form 4473s. During the search, agents seized approximately 170 firearms, ammunition, and smoke/marine markers. All seized firearms and ammunition are detailed in Attachment A of the Indictment. (*See* Doc. # 16).

II.    **ARGUMENT**

In *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), the Supreme Court held that the Second Amendment protects the right of "law-abiding, responsible citizens" to keep firearms in their homes for self-defense. *Heller* clarified that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited" and is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 626.

The Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,* 142 S. Ct. 2111 (2022) held that the Second Amendment protects the right of "ordinary, law-abiding citizens" to "carry a handgun for self-defense outside the home." *Id*. at 2122. *Bruen* clarified the "standard for applying the Second Amendment." *Id*. at 2126-27. First, *Bruen* states that the "Constitution presumptively protects conduct" that the "Second Amendment's plain text covers." *Id*. at 2129-30. Second, if a regulation limits such presumptively protected conduct, "[t]he government must… justify its regulation by demonstrating that it is consistent with the nation's historical tradition of firearm regulation." *Id*. at 2130.

The Supreme Court's recent decision in *United States v. Rahimi,* 144 S.Ct. 1889 (2024), rejected a Second Amendment facial challenge to 18 U.S.C. § 922(g)(8), which bars individuals subject to domestic violence restraining orders from possessing guns. *Rahimi* reaffirmed that although a modern firearms law "must comport with the principles underlying the Second Amendment," "it need not be a 'dead ringer' or 'historical twin.'" *Id.* at 1898.

Applying the Second Amendment framework articulated by the Supreme Court in the above cases requires a conclusion that § 922(g)(5)(A) is constitutional, as numerous lower courts have recognized. *See, e.g., United States v. Sitladeen*, 64 F.4th 978 (8th Cir. 2023); *United States v. Bernabe-Martinez,* No. 22-cr-276, 2024 WL 778114 (D. Idaho Feb. 26, 2024); *United States v.*

*Ramirez*, -- F. Supp.3d –, 2024 WL 115224 (E.D. Wash. Jan. 10, 2024); *United States v. Escobar-Temal*, No. 3:22-crf-393, 2023 WL 4112762 (M.D. Tenn. June 21, 2023); *United States v. Pena-Moreno,* No. 23-20202, 2024 WL 1395139 (E.D. Mich. March 31, 2024); *United States v. Figueroa-Camarillo*, -- F. Supp. 3d --, 2024 WL 1596882 at n.6 (D.N.M. April 12, 2024) (citing cases); *United States v. Rangel-Tapia,* No. 23-1220, 2024 WL 966385 (6th Cir. Mar. 6, 2024) (finding no plain error in an as-applied challenge to Section 922(g)(5)(A) where no circuit court has found the provision unconstitutional either before or after *Bruen*).

**A. The Second Amendment does not apply to aliens illegally in the United States.**

The plain text of the Second Amendment protects the rights of "the people to keep and bear Arms." The Supreme Court in *Heller* explained that the term "the people" in the Second Amendment "unambiguously refers to … members of the political community." *Heller*, 554 U.S. 570 at 580. The Supreme Court has observed elsewhere that "citizenship … is a relevant ground for determining membership in the political community." *Cabell v. Chavez-Salido*, 454 U.S. 432, 438. With regard to aliens, the Court confirmed that they "are by definition those outside of this community." *Id*. at 439-440. *Heller* further emphasized that the "Second Amendment right is exercised individually and belongs to . . . Americans." *Heller*, 554 U.S. 570, 573; *see also id.* at 595 ("right of citizens"); *id*. at 608 (right "enjoyed by the citizen").

In subsequent decisions, the Supreme Court has continued to use the word "citizen" in describing the scope of the Second Amendment. It did so repeatedly in *McDonald v. City of Chicago, Ill.,* 561 U.S. 742 (2010). *See id.* at 768 ("citizens must be permitted to use handguns for the core lawful purpose of self-defense"); *id*. at 770 ("right of the citizens to keep and bear arms"); *id*. at 773 ("right of all citizens to keep and bear arms"); *id*. at 774 ("right of all citizens to keep and bear arms"); *id*. at 776 ("blacks, as citizens, have equal right to protection, and to

5

keep and bear arms for self-defense"). *Bruen* also repeatedly described the right to bear arms as belonging to "citizens." *See Bruen*, 142 St. Ct. at 2122, 2125, 2131, 2133, 2134, 2135, 2138, 2156. So did *Rahimi.* 144 S. Ct. at 1897, 1902, 1903.

This limited understanding of the "people" referenced in the Second Amendment is supported by the historical record. Under the English Bill of Rights, the right to keep and bear arms was not "available to the whole population" but was instead expressly limited to "'Subjects.'" *Heller*, 554 U.S. at 593 (quoting English Bill of Rights 1689, 1 W. & M., ch. 2, § 7, in 3 Eng. Stat. at Large 441)); *see id.* ("By the time of the founding, the right to have arms had become fundamental for English subjects.") (emphasis added)). "[T]he right to own guns in eighteenth-century England was statutorily restricted to the landed gentry," and under "English common law[,] … 'aliens [were] incapacitated to hold lands.'" *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022) (internal citations omitted)); *see also, e.g.*, Granville Sharp, *Tracts, Concerning the Ancient and Only True Legal Means of National Defence, by a Free Militia,* 17, 23 (1781) (describing the "common-law right of the people of England to have arms" as a "right of Englishmen").

"The English view carried across the Atlantic, where it was well understood that the right to bear arms 'did not extend to all New World residents.'" *Jimenez-Shilon*, 34 F.4th at 1047 (quoting Joyce Lee Malcolm, *To Keep and Bear Arms: The Origins of an Anglo-American Right* 140 (1994)). For example, "several colonies enacted complete bans on gun ownership by slaves and Native Americans," based on "alienage or lack of allegiance to the sovereign." *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1047 (11th Cir. 2022) (quotations omitted). Native Americans were considered non-citizens and were not "entitled to the rights of English subjects." *United*

6

*States v. Perez,* 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J., concurring). "Their inability to legally own guns … confirmed their status as outsiders" of the polity. *Id.*

Illegal aliens could historically be excluded from "exercis[ing] the elective franchise," *id.* at 29, as well as from other, closely related "political rights"—including the rights to "hold public office," to "serve on juries," and, most relevant here, "the right to bear arms," Akhil Reed Amar, *The Bill of Rights* 48 (1998); *see also United States v. Perez*, 6 F.4th 448, 462 (2d Cir. 2021) (Menashi, J., concurring in the judgment). As Thomas Cooley explained in his "massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, "the *people* in whom is vested the sovereignty of the State . . . cannot include the whole population," Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union* 28-29 (1st ed. 1868).

During the American Revolution, colonial governments disarmed those who refused to "swear an oath of allegiance to the state or the United States." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 506 (2004); *see id*. at 506 nn.128–29 (compiling statutes); *see also* Churchill, *supra*, 25 L. & Hist. Rev. at 159 ("[T]he new state governments … framed their police power to disarm around a test of allegiance."). During the Revolutionary War, Connecticut passed a law providing that any person who "shall libel or defame" any acts or resolves of the Continental Congress or the Connecticut General Assembly "made for the defence or security of the rights and privileges" of the colonies "shall be disarmed and not allowed to have or keep any arms." Public Records of the Colony of Connecticut 193 (1890) (1775 law). And, in the same era, at the recommendation of the Continental Congress, *see* 4 Journals of the Continental Congress 205 (1906) (resolution

of March 14, 1776), at least six states disarmed the "disaffected" who refused to take an oath of allegiance to those states. *See, e.g., Jackson,* -- F.4th --, 2024 WL 3711155 at *5 (citing Acts).

The Bill of Rights codified the principle that membership in the political community is a prerequisite for the right to bear arms. *See McDonald v. City of Chicago*, 561 U.S. 742, 769–70 (2010) ("The right of *the citizens* to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them." (quoting 3 J. Story, Commentaries on the Constitution of the United States § 1890, p. 746 (1833)) (emphasis added)). Indeed, "Framing-era sources 'refer to arms-bearing as a *citizen's* right' that was closely associated with national fealty and membership in the body politic." *Jimenez-Shilon*, 34 F.4th at 1048 (collecting sources and quoting Note, *The Meaning(s) of "The People" in the Constitution*, 126 Harv. L. Rev. 1078, 1093 (2013)). Accordingly, "many early state constitutions … expressly limited the right to keep and bear arms to 'citizens.'" *Id*. at 1049 (citing Alabama, Connecticut, Kentucky, Maine, Mississippi, and Pennsylvania constitutions); *Perez*, 6 F.4th at 463 & n.6 (Menashi, J., concurring in the judgment) (discussing the same constitutions).

In addition, the Second Amendment expressly references "a well organized militia." U.S. Const. amend. II. "[T]he conception of the militia at the time of the Second Amendment's ratification was the body of all *citizens* capable of military service." *Heller*, 554 U.S. at 628 (emphasis added); *see also Perez,* 6 F.4th at 462 (Menashi, J., concurring in the judgment) (explaining that "non-citizens . . . were neither expected, nor usually allowed, to participate in the militia").

8

Set against this historical background, the defendant, a non-citizen without legal status in the United States, does not fall within the class of persons to whom the Second Amendment's protection applies, as numerous federal courts have recognized. *See United States v. Sitladeen*, 64 F.4th 978, 983-87 (8th Cir. 2023) (holding § 922(g)(5)(A) constitutional post-*Bruen* because undocumented noncitizen was not part of "the people" and therefore had no Second Amendment right to possess a firearm); *United States v. Gonzalez-Peralta,* 2024 WL 3677485 (D. Kan. Aug. 5, 2024); *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) ("[I]llegal aliens do not belong to the class of law-abiding members of the political community to whom the Second Amendment gives protection."); *United States v. Portillo-Munoz*, 643 F.3d 437, 442 (5th Cir. 2011) ("Whatever else the term means or includes, the phrase 'the people' in the Second Amendment of the Constitution does not include aliens illegally in the United States."); *see also United States v. Singh*, 979 F.3d 697, 724 (9th Cir. 2020) (rejecting challenge to § 922(g)(5)(B) and noting that "those unlawfully present . . . are neither citizens nor members of the political community"). Because the Second Amendment does not reach such noncitizens, Defendant's challenge fails.

**B. Congress's authority to categorically disarm illegal aliens is consistent with the tradition of firearms regulation in this nation.**

Even if the Second Amendment's text were not understood to categorically exclude aliens illegally or unlawfully in the United States, this Nation's tradition of firearms regulation would support their categorical disbarment. *See Bruen*, 142 S. Ct. at 2126.

The government can justify a challenged restriction by showing that the regulation is "part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127. But the Supreme Court has cautioned that although a firearms law "must comport with the principles underlying the Second Amendment," "it need not be a 'dead ringer'

9

or 'historical twin.'" *Rahimi*, 144 S.Ct. at 1898 (citation omitted). A modern law can satisfy *Bruen*'s historical standard even if it is not "identical to ones that could be found in 1791." *Id.* at 1897-98. The Second Amendment does not demand "a law trapped in amber." *Id.* at 1897-98. As Justice Barrett emphasized in concurrence in *Rahimi*, "imposing a test that demands overly specific analogues has serious problems," including "forc[ing] 21st-century regulations to follow late-18th-century policy choices," and "assum[ing] that founding-era legislatures maximally exercised their power to regulate." *Id.* at 1925 (Barrett, J., concurring). Even "when a challenged regulation does not precisely match its historical precursors, 'it still may be analogous enough to pass constitutional muster,'" so long as the law "comport[s] with the principles underlying the Second Amendment." *Rahimi*, 144 S.Ct. at 1898. In evaluating proposed historical analogues, "[w]hy and how the regulation burdens the right are central to th[e] inquiry." *Id.*

Section 922(g)(5)(A) is analogous to historical laws that categorically disqualified people from possessing firearms based on a judgment that certain individuals were outside the political community and historical laws that disarmed groups whom it was felt could not be trusted to adhere to the law.

As discussed at length in the previous section, colonial and framing-era statutes routinely forbade the arming of Native Americans, slaves, and Loyalists and those who declined to take an oath of allegiance. Even if these statutes are not understood to limit the interpretation of the Second Amendment's text, they are important historical precursors that "delimit" the "outer bounds of the right to keep and bear arms." *Bruen*, 142 S.Ct. at 2127.

In addition, "[r]eligious minorities, such as Catholics in Maryland, Virginia, and Pennsylvania, were subject to disarmament." *United States v. Jackson*, -- F.4th --, 2024 WL

10

3711155, *5 (8th Cir. Aug. 8, 2024). Catholics were disarmed in Virginia unless they "swore allegiance to the Hanoverian dynasty and to the Protestant succession." *Id*. (Citing Robert H. Churchill, *Gun Regulation, The Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007)). These laws disarming Catholics "followed longstanding English practice." *Perez,* 6 F.4th at 462 (Menashi, J., concurring); *see, e.g.,* 1 W. & M., Sess. 1, c.15, in 6, The Statutes of the Realm 71–73 (1688); *see also Jackson*, 2024 WL 3711155, *5. This practice was based on concerns with a group's perceived propensity to disobey the sovereign and the risk that presented to the social order. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 121-22 (3d Cir. 2023) (Krause, J., dissenting), *cert. granted, judgment vacated sub nom. Garland v. Range*, No. 23-374, 2024 WL 3259661 (July 2, 2024); *Kanter v. Barr*, 919 F.3d 437, 457 (7th Cir. 2019) (Barrett, J., dissenting) (relying on sources concluding that "[the English] Parliament disarmed Catholics because the Protestant majority found them 'untrustworthy'"). The American colonies also disarmed religious groups "whom the authorities believed could not be trusted to obey the law." See *Range*, 69 F.4th at 122 (Krause, J., dissenting); see also *id.* at 122–24 & nn.50-70 (collecting sources).

While the categorical disarmament of religious and ethnic groups would today be understood as abhorrent, these laws nonetheless reveal the historic scope of governmental power to disarm groups on the basis of perceived untrustworthiness at the time the Second Amendment was adopted. Collectively, these laws barring Native Americans, Catholics and other religious groups, and Loyalists and those who declined to take an oath of allegiance from bearing arms demonstrate that the right to bear arms was understood to be limited to those within the political community and who could be trusted to follow the law.

11

Section 922(g)(5)(A) fits comfortably within these historical traditions. Section 922(g)(5) imposes an identical burden as historical laws categorically disarming individuals who lacked membership in the political community or who were viewed as potentially unwilling to comply with the law. In fact, unlike many of the historic restrictions, the burden here is not necessarily permanent because the characteristics that trigger disarmament—being both a noncitizen and unlawfully in this country—are not permanent conditions. Section 922(g)(5)(A) only limits its prohibition on firearms possession to undocumented noncitizens; other noncitizens may lawfully possess firearms under certain circumstances. See 18 U.S.C. § 922(y)(2) (exception to (g)(5)(B) allowing certain noncitizens present under a nonimmigrant visa to possess firearms). And there is even a process for certain noncitizens to obtain a waiver from the firearm prohibition from the Attorney General. See 18 U.S.C. § 922(y)(3).

And the burden is "comparably justified." *Id.* At the time of the founding, disarmament was considered necessary to protect against the danger to the "civic community" posed by those perceived as outside its legal and social norms. *Range v. Att'y Gen. United States*, 53 F.4th 262, 275–79 (3d Cir. 2022), *reh'g en banc granted, opinion vacated sub nom. Range v. Att'y Gen. United States of Am.*, 56 F.4th 992 (3d Cir. 2023), and *on reh'g en banc sub nom. Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023), *cert. granted, judgment vacated sub nom. Garland v. Range*, No. 23-374, 2024 WL 3259661 (July 2, 2024). Section 922(g)(5)(A) is similarly justified by an unlawfully present non-citizen's lack of membership in the political community and the accompanying challenges presented by their possession of firearms.  Aliens who have entered and remained in this country illegally, have "already violated a law of this country."  *United States v. Toner,* 728 F.2d 115, 128 (2d Cir. 1984).  Further, their illegal entry can make them harder to trace and more likely to elude law enforcement.  *United States v.*

*Meza-Rodriquez,* 798 F. 3rd 664, 673 (7th Cir. 2015); *United States v. Huitron-Guizar,* 678 F.3d 1164, 1170 (10th Cir. 2012).  Congress could thus conclude, consistent with historical tradition, that the noncitizens who fall within § 922(g)(5) should be categorically disarmed.

As such, § 922(g)(5) "comport[s] with the principles underlying the Second Amendment," *Rahimi*, 144 S.Ct. at 1898, and is consistent with the nation's historical tradition of firearm regulation. *See, e.g., United States v. Pierret-Mercedes,* -- F. Supp.3d --, 2024 WL 1672034, *21 (D.P.R. April 18, 2024) (finding § 922(g)(5) analogous to laws disarming "Catholics, Native Americans, and the potentially disloyal in the Founding Era"); *United States v. Jeffers,* 2024 WL 1603501 (D.V.I. Apr. 12, 2024) (finding analogous "historic laws disarming individuals who lacked membership in the political community or were unwilling to comply with the law"); *United States v. Escobar-Temal,* No. 3:22-cr-393, 2023 WL 4112762, *5-6 (M.D. Tenn. June 21, 2023) (laws requiring oaths are sufficiently analogous to § 922(g)(5) to find it constitutional); *United States v. Leveille,* 659 F. Supp.3d 1279 (D.N.M. March 7, 2023) (same).

Indeed, that is all the more apparent given the traditional deference afforded Congress in matters related to citizenship and immigration. *See, e.g., Mathews v. Diaz,* 426 U.S. 67, 81 (1976); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n.21 (1976). Here, Congress was entitled to determine that noncitizens who are unlawfully present in the United States, and are therefore potentially subject to removal, should in the meantime not be permitted to possess firearms while they are here. *Cf. Rahimi*, 144 S.Ct. at 1902, (recognizing that where historic laws justified greater restriction of imprisonment, lesser restriction of disarmament was also permissible).

13

## C. § 922(g)(5) is constitutional as applied to Defendant.

Serrano-Restrepo challenges 18 U.S.C. § 922(g)(5) only as applied to him, not on its face. But he cites no authority explaining how this facially valid provision is unconstitutional as to him.

To start, by Serrano-Restrepo's own admission, he entered the United States without authorization in 2008 and he has maintained an illegal status ever since. Although Serrano-Restrepo filed for asylum on July 8, 2022, "[his] pending asylum application … did not constitute a defense to § 922(g)(5). *United States v. Portillo-Saravia,* No. 21-20104, 2022 WL 287557 (5th Cir. 2022) (citing cases); *see also United States v. Elrawy*, 448 F. 3d 309, 314 (5th Cir. 2006) (a Court should "give primacy to the applicant's legal status before he files an application for adjustment of status, as opposed to his current status (permitted to stay in the United States during the pendency of such application."); *United States v. Bazargan*, 992 F.2d 844, 848 (8th Cir. 1993) (grant of employment authorization as a consequence of asylum petition did not make defendant a "legal" alien for purposes of § 922(g)(5)); *United States v. Ochoa-Colchado*, 521 F.3d 1292, 1295-96 (10th Cir. 2008) (pending application for adjustment of status did not remove defendant from § 922(g)(5)(A)); *United States v. Lopez*, 929 F.3d 783, 786 (6th Cir. 2019) (noting § 922(g)(5)(A) continued to apply to persons subject to deferred action under DACA).

Nor do Serrano-Restrepo's circumstances prevent him from being categorically disarmed consistent with the Second Amendment. The historical tradition supports the legislature's ability to disarm categories of individuals—and disarmament need not be based on individualized assessments of dangerousness. *See Jackson*, -- F.4th --, 2024 WL 3711155 , *6 ("Legislatures historically prohibited possession by categories of persons . . . . ."); *Kanter*, 919 F.3d at 464 (Barrett, J., dissenting) (disarmament "is not limited to case-by-case exclusions of

14

persons who have been shown to be untrustworthy with weapons"); *United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) (pre-*Bruen*, explaining that "the Second Amendment permits categorical regulation of gun possession by classes of persons . . . rather than requiring that restrictions on the right be imposed only on an individualized, case-by-case basis").

Here, Congress has created a carefully balanced regime, allowing some but not all aliens to possess firearms, *see* 18 U.S.C. § 922(y)(2), and creating a process for certain noncitizens to obtain a waiver from the firearm prohibition, § 922(y)(3). Congress's carefully delineated judgement that aliens who fall outside these exceptions are categorically prohibited from possessing firearms is consistent with the Second Amendment.

And even if consideration of an alien's individual circumstances could in some circumstances be constitutionally significant, nothing in Serrano-Restrepo's circumstances—which include his 2008 illegal entry (after an earlier attempt), remaining in the United States for years without legal status, and making inaccurate statements about his citizenship and immigration status on required forms in seeking to obtain over 160 firearms—prevents § 922(g)(5) from constitutionally applying to him, just as it applies to others in the prohibited category.

### III. Conclusion

Defendant's challenge to § 922(g)(5) is without merit and the Motion to Dismiss the indictment should be denied.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

s/Heidy T. Carr
**HEIDY CARR (0093524)**
Special Assistant United States Attorney
**ELIZABETH GERAGHTY (0072275)**
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
Phone: (614) 255-1608
Fax: (614) 469-5653
E-mail: Heidy.Carr@usdoj.gov

16

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing Sentencing Memorandum was served this 20th of August 2024, electronically upon Steven Nolder, counsel of record for the defendant.

s/Heidy T. Carr
**HEIDY CARR (0093524)**
Special Assistant United States Attorney
