## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

    **v.**
                           **Case No. 2:24-cr-107**
                               **Judge Edmund A. Sargus, Jr.**

**CARLOS SERRANO-RESTREPO,**

      **Defendant.**

### OPINION AND ORDER

This matter is before the Court on Defendant Carlos Serrano-Restrepo's motion to dismiss an indictment charging him with possession of a firearm by an alien unlawfully in the United States under 18 U.S.C. § 922(g)(5)(A). (ECF No. 25.) Mr. Serrano-Restrepo argues that § 922(g)(5)(A) is unconstitutional under the Second Amendment as applied to him. (*Id.*) The Government opposes that Motion. (ECF No. 26.) Mr. Serrano-Restrepo replied in support of his Motion. (Reply, ECF No. 30.) For the reasons below, Mr. Serrano-Restrepo's Motion is **DENIED**.

### BACKGROUND

### I.    Factual Background

According to the Indictment, Mr. Serrano-Restrepo is an alien, illegally and unlawfully in the United States. (Indictment, ECF No. 16, PageID 28.) He was denied entry into the United States on March 31, 2008. (ECF No. 26-1, PageID 273.) Although the United States Citizenship and Immigration Services ("USCIS") does not have a record of his re-entry, Mr. Serrano-Restrepo represents that he last entered this country on April 17, 2008. (*See* Mot., PageID 63; ECF No. 25-2, PageID 74; *see also* Application for Asylum, ECF No. 26-2, PageID 278.)

A few months later in July 2008, Mr. Serrano-Restrepo obtained an Individual Taxpayer Identification Number ("ITIN") from the Internal Revenue Service. (ECF No. 25-3, PageID 75.)

An ITIN is a tax processing number available to certain nonresidents and resident aliens who cannot acquire a Social Security Number but need to report income.

For many years Mr. Serrano-Restrepo lived in the United States without interacting with law enforcement. He formed a business known as Valda Service Corporation in 2017 with a business partner. (Mot., PageID 63.) That business "specializ[ed] in remediating fire and flooding damage done to homes." (*Id.*) In 2021, Mr. Serrano-Restrepo bought out his partner's interest and became the 100% owner of Valda Services Corporation. (ECF No. 25-5, PageID 92.)

In May 2022, Mr. Serrano-Restrepo moved from Arizona to Ohio after buying a home located at 1800 Lynnbrook Court, Orient, Ohio 43146. (Mot., PageID 63.) Two months later, he applied for asylum in the United States. (Application for Asylum, PageID 286.) The Department of Homeland Security notified Mr. Serrano-Restrepo in August 2022 that he could remain in the United States until his "asylum application is decided." (ECF No. 25-9, PageID 173.) Mr. Serrano-Restrepo's asylum application remains pending.

In September 2022, the Department of Homeland Security sent Mr. Serrano-Restrepo notice that "[t]o process [his] application, petition, or request, [USCIS] must collect [his] biometrics." (ECF No. 25-10, PageID 174.) He was instructed to appear at USCIS in Phoenix for "Biometrics Submissions" and to bring valid photo identification. (*Id.*) Mr. Serrano-Restrepo appeared for his appointment and submitted his biometrics. (Mot., PageID 64.)

In January 2023, he received additional notices confirming that the Department of Homeland Security had received his application for permission to work and encouraged him to create a USCIS account. (ECF Nos. 25-11, 25-12.) One month later, the Department of Homeland Security sent him another notice informing him that his asylum application was considered "prohibited" because he had an obligation to file his application within one year of his "last arrival"

2

into the United States. (ECF No. 25-2, PageID 74.) Mr. Serrano-Restrepo filed his asylum application in 2022, several years after arriving in the United States purportedly on April 17, 2008. (*Id.*) The notice clarified that Mr. Serrano-Restrepo failed to justify his untimely filing and informed him that he was entitled to either meet with an immigration officer to justify his untimely filing, or that he could waive that meeting. (*Id.*; *see also* ECF No. 25-13, PageID 177.)

In March 2023, the Department of Homeland Security notified Mr. Serrano-Restrepo that his application for employment authorization was approved and would remain valid through March 20, 2025. (ECF No. 25-14, PageID 178.) Soon after, the Social Security Administration approved his application for a Social Security Number. (ECF No. 25-15, PageID 179.)

Close in time, the Government alleges that Mr. Serrano-Restrepo purchased several firearms online and had them shipped to a Federal Firearms Licensee (FFL) located in Millersburg, Ohio. (Opp., PageID 254; *see also* Firearms Transaction Records, ECF No. 26-3, PageID 290–91.) He could not retrieve the firearms because he had a Washington state driver's license but he managed to receive two long guns from the same online purchase. (*Id.*) To complete this transaction, Mr. Serrano-Restrepo submitted the Alcohol Tobacco and Firearms ("ATF") Form 4473, stating that he had citizenship in the United States and that he was neither unlawfully in the United States, nor admitted under a nonimmigrant visa. (*See* Firearms Transaction Records, PageID 290–91.)

In May 2023, after being denied firearms because of his Washington state driver's license, Mr. Serrano-Restrepo obtained an Ohio driver's license. (ECF No. 25-18, PageID 244.) He presented his work authorization card to the Ohio Bureau of Motor Vehicles, indicating his status as a temporary resident, and was issued a driver's license that expires on March 20, 2025. (*Id.*) With his Ohio driver's license, he then returned to the FFL in Millersburg, Ohio and retrieved 13

firearms in May 2023. (Firearms Transaction Records, PageID 293–94.) The Form 4473 completed in connection with this transaction contained the same statements that Mr. Serrano-Restrepo had citizenship in the United States and was not unlawfully in the United States or admitted under a nonimmigrant visa. (*Id.*)

Between May 2023 and January 2024, Mr. Serrano-Restrepo bought over 90 additional firearms, visiting the FFL in Millersburg, Ohio at least six more times. (*See* Firearms Transaction Records, ECF No. 26-3.) Each time he completed a purchase, he submitted a Form 4473 representing that he had dual citizenship in the United States and Colombia and that he was not unlawfully in the United States. (*Id.*)

## II.    Procedural Background

On January 10, 2024, ATF agents executed a search warrant on the address listed on Mr. Serrano-Restrepo's Ohio Bureau of Motor Vehicles application and all Form 4473s—1800 Lynbrook Court, Orient, Ohio, 43146. (Opp., PageID 254.) During the search, agents seized approximately 170 firearms, ammunition, and smoke/marine markers. (Indictment, ECF No. 16, PageID 30–35.) Mr. Serrano-Restrepo alleges that "some" of the firearms were kept in his home "for self-defense." (Mot., PageID 65.) He attaches as an exhibit to his Motion pictures illustrating how he "displayed his collection at his home." (Mot., PageID 65; *see also* ECF No. 25-19, PageID 246–251.) In those photos, several firearms were stored in a gun safe, while the handguns were mounted in holsters on the wall of a closet. (*Id.*)

On July 18, 2024, a federal grand jury returned a one count indictment charging Mr. Serrano-Restrepo with possessing a firearm with knowledge that he was an alien illegally and unlawfully in the United States, in violation of 18 U.S.C. § 922(g)(5)(A). (ECF No. 16.) Mr. Serrano-Restrepo now moves to dismiss that indictment.

4

**STANDARD OF REVIEW**

Rule 12 of the Federal Rules of Criminal Procedure states that "[a] party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). A defendant may seek dismissal of a defective indictment under Rule 12(b)(3)(B)(v). The Court can rule on a motion to dismiss before trial "if it involves questions of law instead of questions of fact on the merits of criminal liability." *United States v. Craft*, 105 F.3d 1123, 1126 (6th Cir. 1997); *see also United States v. Med 1st*, No. 3:16-CR-000076-JHM, 2017 U.S. Dist. LEXIS 177365, at *3 (W.D. Ky. Oct. 26, 2017) ("The Court 'may make preliminary findings of fact necessary to decide the questions of law presented by a pre-trial motion so long as the court's findings on the motion do not invade the province of the ultimate finder of fact.'" (quotation omitted)). When ruling on a pretrial motion to dismiss an indictment, the Court reads the indictment "as a whole, accepting the factual allegations as true, and construing those allegations in a practical sense with all the necessary implications." *United States v. McAuliffe*, 490 F.3d 526, 530 (6th Cir. 2007). "An indictment is to be construed liberally in favor of its sufficiency." *Id.* at 531 (citing *United States v. Davis*, 306 F.3d 398, 411 (6th Cir. 2002)).

A defendant may challenge the constitutionality of an indictment by facially attacking the constitutionality of a statute, or as it is applied to the defendant individually. A statute is facially unconstitutional if it is unconstitutional in all of its applications. *See United States v. Rahimi*, 144 S. Ct. 1889, 1898 (2024) (explaining that facial challenges are the "most difficult to mount" because to prevail the Government "need only demonstrate that Section 922(g)[ ] is constitutional in some of its applications"). "In contrast, an as applied challenge alleges the statute in question is unconstitutional as applied to the defendant's alleged conduct." *United States v. Nailor*, No. 23-20076, 2023 U.S. Dist. LEXIS 164652, at *5 (E.D. Mich. Sep. 15, 2023) (citing *Carroll v. City of*

5

*Cleveland*, 522 Fed. App'x 299, 306 (6th Cir. 2013)). Mr. Serrano-Restrepo argues that § 922(g)(5)(A) is unconstitutional as applied to his conduct.

## ANALYSIS

Mr. Serrano-Restrepo argues that his indictment should be dismissed because 18 U.S.C. § 922(g)(5)(A)—which makes it illegal for those unlawfully present in the United States to possess firearms—is unconstitutional under the Second Amendment, at least as applied to him. (Mot., PageID 65.) The basis for Mr. Serrano-Restrepo's Motion is the Supreme Court's decision in *New York State Rifle and Pistol Association v. Bruen*, 597 U.S. 1 (2022), which rejected the previous means-end scrutiny applied by courts to constitutional challenges of firearm regulations.

### I.    The *Bruen* Framework

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court first recognized that the Second Amendment "conferred an individual right to keep and bear arms" for "lawful purposes" including self-defense. 554 U.S. 570, 595, 624 (2008). Two years later in *McDonald v. City of Chicago*, the Supreme Court held that this individual right is also a fundamental right incorporated against the states by the Fourteenth Amendment's Due Process Clause. 561 U.S. 742, 791 (2010).

In the years following *Heller* and *McDonald*, courts developed tests to establish the contours of the Second Amendment right "through a combination of historical analysis and means-end scrutiny." *United States v. Williams*, 113 F.4th 637, 643, 663 (6th Cir. 2024). Courts first asked whether the challenged regulation burdened conduct that historically fell within the scope of that right. *Id.* at 643 (citation omitted). Then the court "balanced the government's asserted interest

6

against the burden imposed by its regulation. If the ends justified the means, the challenger lost." *Id.*

Then came *Bruen*. The *Bruen* Court rejected the use of means-end scrutiny and announced a new analytical framework applicable to Second Amendment challenges. 597 U.S. at 17. The Supreme Court recognized the right of "ordinary, law-abiding citizens to . . . carry handguns publicly for their self-defense" and concluding that the right to carry firearms for self-defense extended outside the home. *Id.* at 9–10 (finding New York's proper cause requirement to carry firearms outside of one's home unconstitutional). To determine whether a particular firearm restriction is constitutional, the Supreme Court instructed courts to ask: (1) whether "the Second Amendment's plain text covers an individual's conduct," and if so, (2) whether "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* The Government can justify its regulation either by showing that the regulated conduct is not protected by the Second Amendment, or that the regulation resembles a historically analogous firearm regulation.

*Bruen* did not explicitly address the constitutionality of firearms statutes like § 922(g)(5)(A). But the only circuit courts, including this one, that have addressed such a challenge after *Bruen* found the statute constitutional. *United States v. Rangel-Tapia*, No. 23-1220, 2024 U.S. App. LEXIS 5591, at *9 (6th Cir. Mar. 6, 2024) (rejecting appellant's as-applied challenge to § 922(g)(5)(A) under plain-error review); *United States v. Sitladeen*, 64 F.4th 978, 983–84, 987 (8th Cir. 2023) (collecting cases and upholding the statute based on pre-*Bruen* precedent).

With that background, the Court turns to Mr. Serrano-Restrepo's challenge.

## II.     The plain text of the Second Amendment protects the conduct regulated by § 922(g)(5)(A).

The Court first looks to whether Mr. Serrano-Restrepo (an immigrant unlawfully present in the United States) and his regulated conduct (possessing a firearm) were covered by the plain

text of the Second Amendment. Mr. Serrano-Restrepo argues that his conduct of possessing a firearm as an immigrant is protected by the Second Amendment's plain text. (Mot., PageID 67–68.) The Government does not suggest that the possession of a firearm is conduct outside the protections under the Amendment but argues that Mr. Serrano-Restrepo himself is not protected because "the people" does not include unlawful immigrants. (Opp., PageID 256–60.) Mr. Serrano-Restrepo does not dispute that he is "an alien" "illegally or unlawfully in the United States" but argues he is nonetheless included in the term "the people" and that his constitutional rights are being infringed. (Mot., PageID 67–68.)

The Supreme Court has suggested that the term "the people" protected by the Second Amendment "refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Heller*, 554 U.S. at 580 (quoting *United States v. Verdugo-Urquidez*, 494 U.S. 259, 265 (1990)). *Heller* clarified that "the people" was not intended to refer to an "unspecified subset" of citizens but to "all members of the political community." *Id.*

The Sixth Circuit, however, has not addressed whether unlawful immigrants can be included in "the people" or what connections are sufficient to entitle unlawful immigrants to the protections of the Second Amendment. *See Rangel-Tapia*, 2024 U.S. App. LEXIS 5591, at *9 (upholding § 922(g)(5)(A) under plain-error standard of review without defining "the people" and emphasizing that no circuit court has found the statute unconstitutional before or after *Bruen*).

Nor is there uniformity among the circuit courts that have addressed the issue. Three circuits concluded that the phrase "the people . . . does not include aliens illegally in the United States." *United States v. Portillo-Munoz*, 643 F.3d 437, 439 (5th Cir. 2011); *United States v. Flores*, 663 F.3d 1022 (8th Cir. 2011) (per curiam); *United States v. Carpio-Leon*, 701 F.3d 974

8

(4th Cir. 2012). But the Seventh Circuit reached the opposite conclusion that unlawful immigrants may be included in "the people" under the Second Amendment. *United States v. Meza-Rodriguez*, 798 F.3d 664, 670–72 (7th Cir. 2015) (explaining that the neither the language of the Second Amendment, nor a broader consideration of the Bill of Rights allows the court "carve out . . . unauthorized (or maybe all noncitizens)" from the protections of the Second Amendment). "[W]hatever [the defendant's] status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term." *Id.* at 671 (citing *Plyler v. Doe*, 457 U.S. 202, 210 (1982)). "[E]ven aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments." *Id.* As a result, a lack of documentation "cannot support a *per se* exclusion from 'the people' protected by the Bill of Rights." *Id.* Despite finding that an unlawful immigrant is entitled to the protections of the Second Amendment, the Seventh Circuit held § 922(g)(5)(A) constitutional on other grounds.

The remaining circuits to have examined the issue—the Second, Ninth, Tenth, and Eleventh Circuits—assumed without deciding that the Second Amendment protections could extend to persons unlawfully present in the country and upheld the constitutionality of § 922(g)(5)(A) on other grounds. *See United States v. Perez*, 6 F.4th 448, 453 (2d Cir. 2021) (assuming, without deciding, that unlawful immigrants have a constitutional right to possess firearms but finding § 922(g)(5)(A) to be a permissible restriction when applied to the facts of the case); *United States v. Torres*, 911 F3d 1253, 1257, 1261 (9th Cir. 2019) (assuming, without deciding, that the Second Amendment extends to persons unlawfully present in the United States but upholding the statute under intermediate scrutiny); *United States v. Huitron-Guizar*, 678 F.3d 1164, 1169 (10th Cir. 2012) (avoiding the constitutional question by assuming that "the people" includes "in the absence of a statute restricting such a right, at least some aliens unlawfully here");

9

*United States v. Jimenez-Shilon*, 34 F.4th 1042, 1045 (11th Cir. 2022) (declining to decide whether Jimenez-Shilon was among "the people" and explaining that he may still be disqualified from possessing firearms without violating the Second Amendment).

Relying on *Heller* and *Verdugo-Urquidez*, Mr. Serrano-Restrepo reasons that he is among "the people" who have a right to bears arms because he "has been part of the national community and developed sufficient connections with the United States to be considered part of its community." (Mot., PageID 68; *see also* Reply, PageID 365–67.) To illustrate his connections to this country, Mr. Serrano-Restrepo explains that during the sixteen years he lived in the United States he sought asylum and was allowed to remain in the country to pursue employment. (*Id.*; *see also* Application for Asylum, ECF No. 26-2, PageID 286; ECF No. 25-9, PageID 173.) He complied with all requests for information he received from USCIS. (*See, e.g.*, ECF No. 25-10, PageID 174.) He obtained an ITIN, a Social Security Number, and paid taxes. (Mot., PageID 68; *see also* ECF No. 25-3, PageID 75 (ITIN); ECF No. 25-15 (Social Security); ECF No. 25-4 (Tax Return).) He also formed and operated a successful business and purchased property in this country. (ECF No. 25-5, PageID 92.) According to Mr. Serrano-Restrepo, his conduct reveals connections great enough to qualify him as a member of the national political community and entitled to protections under the Second Amendment. (Mot., PageID 68.)

Regardless of his status under our country's immigration laws, Mr. Serrano-Restrepo is "surely a 'person' in any ordinary sense of that term." *Meza-Rodriguez*, 798 F.3d at 671. As a result, he is guaranteed certain protections under the Constitution and his lack of documentation does not support a *per se* exclusion from "the people" protected by the Bill of Rights. *See id.* Without guidance to the contrary from the Sixth Circuit, this Court presumes the term "the people" is construed broadly and could include some immigrants unlawfully present in this country. *See*

10

*Heller*, 554 U.S. at 580–81 (concluding "the people" "unambiguously refers to all members of the political community"); *see also United States v. Goins*, 647 F. Supp. 3d 538, 547 (E.D. Ky. 2022) ("Treating some groups as not part of the people protected under the Second Amendment is also inconsistent with *Heller*."). Because the Court can resolve Mr. Serrano-Restrepo's Motion based on whether history and tradition supports the challenged regulation, the Court declines to reach a definitive conclusion on whether Mr. Serrano-Restrepo is a member of "the people," but will assume without deciding that he is for the purposes of the analysis below. *See Perez*, 6 F.4th at 453 (assuming that the Second Amendment protects unlawfully present immigrants); *Torres*, 911 F.3d at 1257 (same); *Jimenez-Shilon*, 34 F.4th at 1045–46 (same).

### III.    The Government established that § 922(g)(5)(A) falls within this Nation's history and tradition of firearms regulation.

A challenged regulation is consistent with the Nation's history and tradition of firearm regulation if it "addresses a general societal problem that has persisted since the 18th century." *Bruen*, 597 U.S. at 26. But when a regulation addresses "unprecedented societal concerns or dramatic technological changes," drawing historical analogies "may require a more nuanced approach." *Id.* at 27. Nuance is required because the Constitution "must apply to circumstances beyond those the Founders specifically anticipated." *Id.* at 28 (citation omitted). Thus, the Court may look to "relevantly similar" regulations, rather than distinctly similar regulations, and engage in reasoning by analogy. *Id.* (requiring a distinctly similar historical regulation when the general societal problem persisted since the 18th century).

The Government will meet its burden if it can point to a historical regulation that burdens the Second Amendment right for similar reasons and in a similar way as the challenged regulation. *Id.* at 29–30 (explaining that the relevant metrics are "how and why" the regulations burden the Second Amendment right). But this analogical framework is not intended to be a

11

"regulatory straightjacket." *Id.* The government need only identify a "well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 30 (emphasis in original).

### A. The possession of firearms by immigrants unlawfully present in the United States was not a general societal problem in the Founding era.

The general societal problem addressed by § 922(g)(5)(A) is "one of more recent vintage." *United States v. Pierret-Mercedes*, No. 22-430 (ADC), 2024 U.S. Dist. LEXIS 74103, at *21 (D.P.R. Apr. 18, 2024) (upholding constitutionality of § 922(g)(5)(A) under history and tradition prong of the *Bruen* analysis). The United States did not implement federal immigration controls until the late 19th century. *Kleindienst v. Mandel*, 408 U.S. 753, 761 (1972) ("Until 1875 alien migration to the United States was unrestricted."); *Padilla v. Kentucky*, 559 U.S. 356, 360 (2010) (citations omitted) (describing the Nation's early history as a "a period of unimpeded immigration"). The lack of federal immigration regulation suggests that the presence of unlawful immigrants in the United States, and by extension their possession of firearms, was not a general societal problem that the Founders addressed in any significant manner. Thus, the Court must look to analogous historical regulations that burdened the Second Amendment right for similar reasons, or in the same way. *Bruen*, 597 U.S. at 29–30.

### B. Oath-based restrictions provide a sufficient historical analogue to show that § 922(g)(5)(A) is congruent with historical firearms regulations.

Reasoning by analogy allows the Court to compare the Founders' treatment of certain problems to new problems that they could not have anticipated. The Government argues that disarming unlawful immigrants is consistent with the Nation's history of disarming those who are not members of the "political community." At the time the Second Amendment was ratified in 1791, the Government contends that the Second Amendment did not protect the right to bear arms of "outsiders," such as Native Americans, Catholics, and Loyalists who refused to swear oaths of allegiance. (Opp., PageID 261–62.) These outsiders were disarmed because they were perceived

12

as dangerous to public safety or social stability, and thus not trusted to possess firearms. (*Id.*) The Government reasons such regulations are analogous to § 922(g)(5)(A). (*Id.*)

In England, before the Revolutionary War, the right to bear arms was not made available to the whole population. Instead, the right was limited in the English Bill of Rights to the "Subjects which are Protestants, . . . suitable to their Conditions, and as allowed by Law." 1 W. & M. Sess. 2, ch. 2, § 7, in 3 Eng. Stat. at Large 441 (Eng. 1689); (*See* Opp., PageID 262.). Catholics who refused to renounce their faith were disarmed by statute. *See* An Act for the Better Securing the Government by Disarming Papists and Reputed Papists, 1 W. & M., Sess. 1, ch. 15 (Eng. 1688). But by swearing loyalty to the crown, Catholics could regain their right to bear arms. *Id.*

When the right to bear arms made its way to the American colonies, so too did the prohibition on Catholics owning firearms unless they swore loyalty. *See Heller*, 554 U.S. at 593 (describing the right to bear arms in the English Bill of Rights as the "predecessor to our Second Amendment"). Several states, including Virginia, Maryland, and Pennsylvania, restricted religious minorities' right to possess firearms. *Pierret-Mercedes*, 2024 U.S. Dist. LEXIS 74103, at *40; *Range v. Att'y Gen. U.S.*, 69 F.4th 96, 124 (3d Cir. 2023) (en banc) (Krause, J., dissenting) (describing how the colonies "continued the English practice of disarming Catholics based on their perceived unwillingness to adhere to the King's sovereign dictates"), *vacated sub nom.*, *Garland v. Range*, No. 23-374, 2024 U.S. LEXIS 2917 (July 2, 2024).

Virginia, for example, required individuals to swear allegiance to the "Hanoverian dynasty and to the Protestant succession and to swear an oath abjuring the ecclesiastical authority of the Pope." *United States v. Leveille*, 659 F. Supp. 3d 1279, 1284 (D.N.M. 2023) (citing Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 Law & Hist. Rev. 139, 157 (2007)). Such an oath was

13

problematic for Catholics, who believed the Pope was their ecclesiastical authority. *Id.* But if Catholics swore this oath, their weapons would be returned. *Id.*

Likewise, before the Revolutionary War, colonial governments often disarmed persons "unwilling to affirm [their] allegiance to the British Crown." *Jimenez-Shilon*, 34 F.4th at 1047–48 (quoting Adam Winkler, Gun Fight: The Battle Over the Right to Bear Arms in America 116 (2011)). As the American Revolution gained favor, the "practice of conditioning people's ability to keep and bear arms on their 'undivided allegiance to the sovereign' continued as . . . people who did not support the Revolution were ordered to turn over their guns." *United States v. Gil-Solano*, 699 F. Supp. 3d 1063, 1070 (D. Nev. 2023) (quoting *Jimenez-Shilon*, 34 F.4th at 1048). For example, Massachusetts disarmed those "notoriously disaffected to the Cause of America, or who refuse to associate to defend by Arms the United American Colonies." Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 Fordham L. Rev. 487, 507 (2004) (citations omitted).

In the same spirit, many individual states conditioned the right to bear arms on the swearing of an oath of allegiance to the individual state. *United States v. Jackson*, 110 F.4th 1120, 1126 (8th Cir. 2024) (collecting statutes from states including Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey). Pennsylvania required "all white men over eighteen to swear an oath declaring allegiance to the commonwealth, abjuring all allegiance to the British monarchy, and promising to do nothing injurious to the freedom and independence of the state." Churchill, *supra*, at 159. Anyone who failed to swear this oath was disarmed. *Id.*

These statutes reveal that there was a "well-established" tradition of prohibiting the possession of firearms by those who did not swear loyalty to their government or political community. Those who did not swear an oath were perceived as dangerous to the political

community due to their divided loyalties. *Pierret-Mercedes*, 2024 U.S. Dist. LEXIS 74103, at *45 (citing *NRA of Am. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 200 (5th Cir. 2012) (citing Cornell & DeDino, 73 Fordham Law Rev. at 507–08) ("Although these Loyalist were neither criminals nor traitors, American legislators had determined that permitting these persons to keep and bear arms posed a potential danger. . . to disrupt society."). Oath-based restrictions prevented firearms from ending up in the hands of those who "have not demonstrated allegiance to this nation [and] might . . . do the nation harm." *Leveille*, 659 F. Supp. 3d at 1285. These restrictions, although perhaps flawed, reflected an attempt to distinguish between those "likely to comply with certain communal obligations" and societal norms, and those less likely to do so. *United States v. Escobar-Temal*, No. 3:22-cr-00393, 2023 U.S. Dist. LEXIS 107133, at *13 (M.D. Tenn. June 21, 2023) (finding laws requiring oaths sufficiently analogous to § 922(g)(5)(A) under *Bruen*). "Unlawful presence in the United States correlates with potential noncompliance with certain government registrations and identification, which may result in different levels of communal participation." *Id.* (explaining that unlawful presence "is demarcated as a line of civic significance that symbolically defines the relationship between the state and individual").

At this juncture, it is worth noting that this Court is of course duty-bound to apply precedent from higher courts and it does so in this opinion. In the view of the undersigned, citing historical antecedents that would today be violations of due process or equal protection guarantees is inconsistent with the Constitution.

Today's immigration system functions as a "proxy for national allegiance." *Leveille*, 659 F. Supp. 3d at 1284. Although an imperfect comparison, persons unlawfully in the United States are not presumed to have any allegiances to the United States. *Id.* at 1285; *see also United States v. Vazquez-Ramirez*, 711 F. Supp. 3d 1249, 1259 (E.D. Wash. 2024). Following this reasoning,

several district courts held post-*Bruen* that § 922(g)(5)(A) is sufficiently analogous to the history and tradition of restricting the possession of firearms by those who refused to swear an oath of allegiance to the United States. *E.g.*, *Leveille*, 659 F. Supp. 3d at 1284; *Escobar-Temal*, 2023 U.S. Dist. LEXIS 107133, at *13; *United States v. Dasilva,* No. 3:21-CR-267, 2022 U.S. Dist. LEXIS 213106, at *33 (M.D. Pa. Nov. 23, 2022); *Gil-Solano*, 699 F. Supp. 3d at 1072; *United States v. Santos-Santana*, No. 23-311 (GMM), 2024 U.S. Dist. LEXIS 7290, at *10 (D.P.R. Jan. 8, 2024); *Vazquez-Ramirez*, 711 F. Supp. 3d at 1259; *compare with United States v. Sing-Ledezma*, 706 F. Supp. 3d 650, 673 (W.D. Tex. 2023) (concluding that the Government failed to put forth a historical tradition sufficiently analogous and finding § 922(g)(5)(A) unconstitutional).

Thus, disarming unlawful immigrants like Mr. Serrano-Restrepo who have not sworn allegiance to the United States comports with the Nation's history and tradition of firearm regulations. Mr. Serrano-Restrepo's as-applied challenge lacks merit. The swearing of an oath of allegiance occurs through the naturalization process, not through his asylum application or his years of living in the United States. Consequently, § 922(g)(5)(A) is not unconstitutional as applied to him.

## CONCLUSION

For the reasons above, Mr. Serrano-Restrepo's Motion to Dismiss the Indictment is **DENIED**. (ECF No. 25.) This matter is set for a trial by jury to commence on January 21, 2025. (ECF No. 29.)

**IT IS SO ORDERED.**

**11/21/2024**                                  **s/Edmund A. Sargus, Jr.**
**DATE**                                        **EDMUND A. SARGUS, JR.**
                                                **UNITED STATES DISTRICT JUDGE**